UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| GARY JET CENTER, INC. | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
| | ) Civil Case No. 15-368 |
| v. | ) |
| | ) |
| AFCO AvPORTS MANAGEMENT LLC, | ) |
| GARY/CHICAGO INTERNATIONAL | ) |
| AIRPORT AUTHORITY, | ) ***Preliminary and Permanent*** |
| STEPHEN MAYS, | ) ***Injunctive Relief Requested*** |
| DENISE DILLARD, | ) |
| ALESIA PRITCHETT, | ) |
| JAMES COOPER, and | ) |
| SHONTRAI IRVING, | ) |
| | ) |
|         Defendants. | ) |

## COMPLAINT

For its complaint against the Defendants, AFCO AvPORTS Management LLC ("AvPORTS"); Gary/Chicago International Airport Authority ("Authority"); and Stephen Mays, Denise Dillard, Alesia Pritchett, James Cooper, and Shontrai Irving (collectively, the "Boardmembers"), Plaintiff Gary Jet Center, Inc. states as follows:

## Introduction

1.     The Authority, at the direction of AvPORTS, is improperly using its legislative authority as an Indiana municipality to unilaterally rewrite material terms in Gary Jet Center's lease with the Authority.

2.     In late 2006 and early 2007, when the parties were negotiating Gary Jet Center's current 39-year lease to use the Gary/Chicago International Airport ("Gary Airport") to provide aeronautical services, the Authority sought to include a requirement that Gary Jet Center pay a percentage of its gross revenues to the Authority as a term of the new lease.

3.      Gary Jet Center strongly opposed including such a term in the lease.

4.      After further negotiations, the parties agreed that—instead of a percentage of Gary Jet Center's gross revenues—Gary Jet Center would pay the Authority "Supplemental Rent," an additional rental payment equal to 10% of all the fees that Gary Jet Center paid to the Authority each year.

5.      For the last eight years, the parties have abided by their agreement, which is memorialized in the January 1, 2007 First Amended Lease Agreement between Gary Jet Center and the Authority (the "2007 Lease").

6.      Now, however, at the direction of its airport manager, AvPORTS, the Authority has unilaterally changed the deal the parties struck in 2007. Among other things, the Authority and AvPORTS are now requiring Gary Jet Center to pay to the Authority 1.5% of Gary Jet Center's gross revenues.

7.      The Authority's 1.5% gross revenue tax is more than *four times* what Gary Jet Center is currently paying to the Authority in rent and Supplemental Rent combined.

8.      The Authority and AvPORTS cannot unilaterally change material terms in Gary Jet Center's lease with the Authority and fundamentally alter the economics of the deal the parties negotiated in 2007.

9.      The Contract Clause of the United States Constitution prohibits a municipality, like the Authority, from using its legislative power to unilaterally renegotiate material terms in a contract that the municipality has with a private party. *See, e.g.*, *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) (finding that the City of Santa Ana unconstitutionally impaired a contract with a gas company when it attempted to require by ordinance an additional fee not required by the plaintiff's contract with the City); *E & E Hauling, Inc. v. Forest Preserve Dist. of Du Page County, Ill.*, 613 F.2d 675 (7th Cir. 1980) (allowing a claim to go forward under the Contract

2

Clause against a county for passing legislation prohibiting conduct that the county had previously contractually agreed to allow).

10.     Because that's exactly what the Authority and AvPORTS are attempting to do here, the 1.5% tax on Gary Jet Center's gross revenues is unconstitutional under the Contract Clause, U.S. Const. Art. I, § 10, cl. 1.

11.     Moreover, the 1.5% gross revenue tax also exceeds the Authority's statutory powers under state law.

12.     The Indiana Legislature has not granted airport authorities, like the Authority, the power to levy a general business income tax like the 1.5% gross revenue tax the Authority has enacted.

13.     If the Authority and AvPORTS wanted to charge Gary Jet Center 1.5% of its gross revenues to do business at the airport, the Authority should have negotiated for such a payment during the lease negotiations in 2007.

14.     But because the Authority expressly negotiated away a right to include such a provision in Gary Jet Center's lease in exchange for Supplemental Rent, the Authority is precluded from using its legislative power to force Gary Jet Center to accept such a term now.

15.     If left unchecked, the Authority's and AvPORTS's unlawful actions will mean the end of private investment at the Gary Airport. No reasonable business is going to spend millions of dollars to build a building at the Gary Airport (and no lender will provide the capital to do so) if the Authority can—at any time during a long-term lease—unilaterally quadruple the rent.

16.     Gary Jet Center therefore requests (among other things) that this Court declare the 1.5% gross revenue tax unconstitutional, *ultra vires*, and void; enjoin the enforcement of that unconstitutional and unlawful provision; and award Gary Jet Center its attorney's fees for bringing this action under 42 U.S.C. § 1988.

## Parties and Jurisdiction

### A.    Gary Jet Center

17.     Plaintiff Gary Jet Center is an Indiana corporation with its principal place of business in Gary, Indiana.

18.     Gary Jet Center is a Fixed Base Operator ("FBO") at the Gary Airport.

19.     An FBO operates like a service station for aircraft owners.

20.     Among other services, an FBO provides fuel, hangar space, and maintenance for a wide variety of airplanes and helicopters.

21.     With over 50 employees, Gary Jet Center is currently the largest private employer providing aeronautical services at the Gary Airport. During the 25 years that Gary Jet Center has operated at the Gary Airport, Gary Jet Center has invested over $10 million in improvements at the Airport.

22.     Under the terms of its 2007 Lease with the Authority, Gary Jet Center uses—but does not own, lease, or maintain—the fuel farm at the Gary Airport to store aviation fuel. In the past, Gary Jet Center has shared the fuel farm with other airport operators, such as Niemeyer Aviation. Currently, Gary Jet Center is sharing the fuel farm both with the Authority and with East Lake Management and Development Company ("East Lake"), another FBO at the Gary Airport that uses one of the 12,000-gallon tanks at the fuel farm.

### B.    AvPORTS

23.     Upon information and belief, Defendant AvPORTS is a Delaware limited liability company with its principal place of business in Virginia.

24.     Thomas B. Bartlett is the Executive Vice President and Chief Operating Officer of AvPORTS.

25.     Under its Airport Management Agreement with the Authority, AvPORTS has "the sole and exclusive right . . . to serve as the Authority's Airport Manager" for the Gary Airport and "shall provide uninterrupted, safe, timely, professional and reliable management of the Airport."

26.     At all times relevant to this lawsuit, AvPORTS was performing a public function by acting as the Airport Manager for the Gary Airport.

## C.     The Authority and Boardmembers

27.     Defendant Authority is a municipal corporation under Indiana law that may sue and be sued under Indiana Code § 8-22-3-11(1).  The Authority's principal place of business is in Gary, Indiana.  The Authority owns and operates the Gary Airport in Lake County, Indiana.

28.     The Authority, not Gary Jet Center, owns the fuel farm.

29.     Defendants Stephen Mays, Denise Dillard, Alesia Pritchett, James Cooper, and Shontrai Irving are citizens of Indiana who are current members of the Authority's Board. The Authority's Board, through the Boardmembers, exercises the policymaking and legislative powers of the Authority pursuant to Indiana Code § 8-22-3-3.

## D.     Jurisdiction and Venue

30.     This Court has subject-matter jurisdiction over Gary Jet Center's claims under 28 U.S.C. §§ 1331, 1343(a)(3), and 1367:

    a)  This Court has subject-matter jurisdiction over Gary Jet Center's claim asserting that the Airport Authority is violating 42 U.S.C. § 1983 under 28 U.S.C. § 1343(a)(3); and

b) This Court has subject-matter jurisdiction over Gary Jet Center's state-law claims under 28 U.S.C. § 1367 because those claims arise from the same set of operative facts as Gary Jet Center's § 1983 claim.

31.    The Court has personal jurisdiction over all the parties to this action.

32.    Venue of this action in the Northern District of Indiana, Hammond Division is based on 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to Gary Jet Center's claims occurred in this District.

## **Factual Background**

33.    This is the second time in three years that the Authority has violated Gary Jet Center's constitutional rights.

34.    The first time, the Authority violated Gary Jet Center's equal protection rights when the Authority intentionally waived the regulations governing full-service FBOs at the Gary Airport to give Gary Jet Center's competitor, East Lake, an unfair leg up.

35.    Now, the Authority is at it again: it is seeking to undo material terms in the 2007 Lease by (1) requiring Gary Jet Center to maintain the fuel farm, which the Authority is not required to do under the 2007 Lease; (2) unilaterally increasing the rental rate Gary Jet Center must pay in the 2007 Lease; and (3) unilaterally imposing a gross revenue tax that is *four times* what Gary Jet Center is currently paying under the 2007 Lease in rent and Supplemental Rent combined.

36.    The Authority is undoing those lease terms under the guise of regulation, namely, the minimum standards that it adopted on September 14, 2015. Because those standards substantially impair Gary Jet Center's contract with the Authority by fundamentally altering the deal that the parties struck in the 2007 Lease, they are unlawful and should be enjoined.

**A.      From 1991 to 2007, the Authority never assessed a tax on Gary Jet Center's gross revenues.**

37.      Gary Jet Center began operating at the Gary Airport after entering into a lease with the Authority on December 9, 1991 (the "Original Lease"). A true and correct copy of the Original Lease is attached to this Complaint as Exhibit A.

38.      The Original Lease was for a 20-year term, with two 10-year renewals. Original Lease at 10, Art. IV(A) and (B).

39.      The Purpose of the Original Lease was to give Gary Jet Center "the right and privilege to conduct business as a Full Service Fixed Base Operator . . . at the Airport." *Id*. at 3, Art. I(A).

40.      In exchange for the right to conduct business as an FBO at the Airport, the Original Lease required Gary Jet Center to pay to the Authority "the lesser" of:

   a)   "Total Revenue," which consisted of fixed "Annual Rent" plus fuel flowage fees and landing fees, *id*. at 13, Art. V(C); or

   b)   "[T]hree percent (3%) of applicable Gross Receipts" from Gary Jet Center's operations, *id*. at 12, Art. V(A).

41.      The parties operated under the Original Lease for 15 years.

42.      During that timeframe, and pursuant to the Original Lease, the Authority collected Annual Rent, fuel flowage fees, and landing fees from Gary Jet Center.

43.      Gary Jet Center never paid, and the Authority never attempted to collect, a percentage of Gary Jet Center's gross revenues.

**B.     When Gary Jet Center renegotiated its lease with the Authority in 2007, the Authority attempted to negotiate a lease payment consisting of a percentage of Gary Jet Center's gross revenues.**

44.     In 2006, Gary Jet Center began planning to construct a $5 million state-of-the-art hangar.

45.     In order to finance the project, Gary Jet Center's lender required Gary Jet Center to obtain an extension on the term of the Original Lease from the Authority.

46.     The parties began negotiating the lease extension in the fall of 2006.

47.     Because the lease extension was going to govern the parties' relationship for a very long time—39 years—the parties carefully negotiated the terms of the lease extension.

48.     At the time the parties began negotiating the lease extension, the Authority's Fixed Base Operator Rules and Regulations ("FBO Rules"), which governed FBOs at the Gary Airport, contained a 1.5% charge on gross revenue. A genuine and authentic copy of the FBO Rules is attached to this complaint as Exhibit B.

49.     The FBO Rules stated that the Authority "intend[ed] to enforce" that 1.5% provision "for all commercial FBO services on the airport on or after" January 1, 2001 "pending the expiration of existing leases which do not incorporate these terms." FBO Rules at 8, ¶ 7(i); *see id.*, ¶¶ 7(a)(7), 7(b)(4), 7(c)(4), 7(d)(3), 7(e)(4), and 7(f)(4).

50.     Gary Jet Center's Original Lease did not contain the 1.5% payment on gross revenue set forth in the FBO Rules, and the Authority had never collected, or sought to collect, such a payment from Gary Jet Center at any time before the negotiations for the lease extension.

51.     But as part of the negotiations for the lease extension, the Authority now pressed Gary Jet Center for a provision in the new lease requiring Gary Jet Center to pay the Authority a percentage of Gary Jet Center's gross revenues.

8

52.     Gary Jet Center viewed the Authority's gross revenue proposal as "totally unacceptable." At that time, adding even 1% of Gary Jet Center's gross revenues to Gary Jet Center's lease payments would cause those lease payments to skyrocket, "effectively rais[ing] the rent by $80K+/year."

## C.   The Authority agreed to accept Supplemental Rent instead of a percentage of Gary Jet Center's gross revenues, and the parties memorialized that agreement in the 2007 Lease.

53.     Representatives of Gary Jet Center searched for an alternative to the Authority's gross revenue proposal that would satisfy the Authority's "desire to get a percentage of something," while at the same time keeping Gary Jet Center's rent from going through the roof.

54.     What Gary Jet Center settled on was the concept of "Supplemental Rent": a yearly payment consisting of 10% of all the fuel flowage, parking, and landing fees that Gary Jet Center remitted to the Authority during that year.

55.     Gary Jet Center proposed Supplemental Rent to the Authority in January 2007 as an alternative to paying the Authority a percentage of its gross revenues.

56.     In response, the Authority agreed to accept Supplemental Rent as an alternative to Gary Jet Center paying the Authority a percentage of its gross revenues.

57.     The parties memorialized this agreement in Article V(C) of the 2007 Lease. A genuine and authentic copy of the 2007 Lease is attached to this Complaint as Exhibit C.

58.     In addition to Supplemental Rent in Article V(C), the 2007 Lease specifically lists out all the other rental and fee payments that Gary Jet Center is obligated to make to the Authority in exchange for operating as an FBO at the Gary Airport and using the Gary Airport's facilities.

59.     According to the 2007 Lease, Gary Jet Center must pay the Authority base rent of $.39 per square foot (adjusted by the consumer price index ("CPI") as set forth in paragraph A of Article V), Supplemental Rent, fuel flowage fees, landing fees, and parking fees.

60.     In contrast to those specific payments, the 2007 Lease does not require Gary Jet Center to pay to the Authority any percentage of Gary Jet Center's gross revenues.

61.     In addition, the 2007 Lease stated that Gary Jet Center had to follow the FBO Rules "except when those provisions" were "expressly contravened by the provisions" in the 2007 Lease. 2007 Lease at 3, Art. 1(B).

62.     Because the 2007 Lease did not contain a provision requiring the 1.5% gross revenue payment in the FBO Rules, and because requiring Gary Jet Center to make the 1.5% gross revenue payment in the FBO Rules would have contravened the parties' agreement on Supplemental Rent, Gary Jet Center did not need to make—and has never made—such a payment to the Authority.

**D.     The parties' course of performance under the 2007 Lease has been consistent with the agreement the parties reached on Supplemental Rent.**

63.     Until now, the parties have followed the agreement set forth in the 2007 Lease.

64.     From 2007 to the present, Gary Jet Center has made all the payments required by the 2007 Lease—including the Supplemental Rent payments.

65.     From 2007 to the present, and consistent with the parties' agreement on Supplemental Rent, Gary Jet Center has not paid the Authority a percentage of its gross revenues.

66.     Likewise, from 2007 to the present, the Authority has accepted Gary Jet Center's Supplemental Rent payments without objection.

67.     From 2007 to the present, the Authority has never collected, or attempted to collect, a percentage of Gary Jet Center's gross revenues.

**E.     The 2007 Lease requires the Authority, not Gary Jet Center, to pay to maintain the fuel farm, and the parties have performed under the 2007 Lease consistent with that understanding.**

68.     In addition to Supplemental Rent, the 2007 Lease differed from the Original Lease in that the 2007 Lease did not require Gary Jet Center to pay to maintain the fuel farm.

69.     Whereas the Original Lease stated, in Article III(A), that "[i]t shall be the sole responsibility of [Gary Jet Center] to keep, maintain, repair and operate the . . . fuel farm tanks" at Gary Jet Center's "sole cost and expense," the 2007 Lease did not contain such language.

70.     In keeping with that provision's exclusion from the 2007 Lease, from 2007 to the present, the Authority has paid to maintain the fuel farm, not Gary Jet Center.

**F.     The Authority is now attempting to unilaterally renegotiate Gary Jet Center's 2007 Lease by requiring Gary Jet Center (1) to pay to maintain the fuel farm; (2) to pay a rental rate in excess of the rate contained in the 2007 Lease; and (3) to pay a 1.5% tax on its gross revenues to the Authority instead of Supplemental Rent as contained in the 2007 Lease.**

71.     Relying on the promises that the Authority made in the 2007 Lease—including the promise to collect Supplemental Rent in lieu of a percentage of Gary Jet Center's gross revenues—Gary Jet Center has invested more than $10,000,000 at the Gary Airport since 2007, building, not one, but two brand-new, state-of-the-art hangars at the Gary Airport.

72.     But after Gary Jet Center has invested those millions of dollars at the Gary Airport, the Authority is now attempting to materially alter the economic terms of the agreement the parties reached in 2007 and unilaterally negate the express terms of the 2007 Lease addressing rent, Supplemental Rent, and fuel farm maintenance.

73.     The Authority is now going to require Gary Jet Center to pay $.50 per square foot in rent rather than the current $.43 per square foot based on the rental calculation in the 2007 Lease.

74.     The Authority is also going to require Gary Jet Center to pay to maintain the fuel farm, which contradicts the terms of the 2007 Lease as well as the parties' course of performance under the 2007 Lease.

75.     Lastly, the Authority is undoing the agreement the parties reached in the 2007 Lease on Supplemental Rent. Rather than pay Supplemental Rent as set forth in the 2007 Lease, the Authority is going to instead require Gary Jet Center to pay a 1.5% tax on Gary Jet Center's yearly gross revenues (less revenues from fuel sales and aircraft sales).

76.     The 1.5% tax on gross revenue dwarfs what Gary Jet Center agreed in the 2007 Lease to pay the Authority to operate as an FBO at the Gary Airport.

77.     Gary Jet Center's Supplemental Rent payments under the 2007 Lease are around $25,000 a year. A payment of 1.5% of Gary Jet Center's gross revenues would be more than *six times* that amount. And it would be *four times* what Gary Jet Center is currently paying under the 2007 Lease in both rent and Supplemental Rent *combined*.

78.     The Authority has no legal basis for unilaterally quadrupling what Gary Jet Center pays the Authority to use the Gary Airport.

79.     The Authority cannot unilaterally rewrite material terms in the 2007 Lease—like rent, Supplemental Rent, and fuel farm maintenance—under the guise of using its power as a municipal government to regulate airport businesses.

80.     The ability to regulate airport businesses does not give the Authority carte blanche to change material terms in its leases with airport businesses at a whim. Such a power would

render all leases with the Authority illusory—and would deter any long-term private investment at the Gary Airport.

## G. The Authority, at AvPORTS's direction and over Gary Jet Center's objection, used the minimum standards revision process to pass a new percentage gross revenue tax that substantially impairs Gary Jet Center's contractual rights under the 2007 Lease.

81.     The Authority first communicated that it was going to require the new 1.5% tax on gross revenues while Gary Jet Center was helping the Authority update and revise the minimum standards that govern aviation businesses at the Gary Airport.

82.     The Federal Aviation Administration strongly encourages municipalities that run federally funded airports to pass minimum standards so as to ensure that each airport is available for use by all on equal terms.

83.     Besides preventing unjust discrimination amongst airport users, minimum standards should promote safety, safeguard airport users from unlicensed and unauthorized services, ensure that adequate services are available to all airport users, reasonably protect the investment of airport businesses able to meet the minimum standards from competition not making a similar investment, and maximize operational efficiency.

84.     In 1990, the Airport had adopted the FBO Rules to serve those purposes.

85.     But by 2007, a good portion of the FBO Rules had become outdated and no longer made sense.

a)   For example, the FBO Rules required that each airport business "[s]hall deliver to the Airport Authority a fidelity bond of $10,000 and a performance bond for the faithful performance of the terms and conditions in the lease in the sum of $100,000 renewable annually for the complete term of the lease." FBO Rules at 3, ¶ 7(a)(9).

13

      i)      That provision no longer made sense given the millions of dollars that Gary Jet Center had invested in hangars at the Gary Airport.

      ii)     Those state-of-the-art hangars—and the millions of dollars in other investments that Gary Jet Center has made at the Airport—provide more than adequate security for Gary Jet Center's performance during the term of the 2007 Lease.

b) Similarly, the FBO Rules required a full-service FBO to provide flight-training services. *Id.* at 2, ¶ 7(a)(2); *id.* at 6, ¶ 7(e). However, the market for flight-training services does not currently exist at the Gary Airport.

c) In addition, the FBO Rules contained a 1.5% charge on gross revenue, which the Authority "intend[ed] to enforce . . . for all commercial FBO services on the airport on or after" January 1, 2001, "pending the expiration of existing leases which do not incorporate these terms." FBO Rules at 8, ¶ 7(i); *see id.*, ¶¶ 7(a)(7), 7(b)(4), 7(c)(4), 7(d)(3), 7(e)(4), and 7(f)(4).

      i)      As explained above, that provision was no longer necessary given Gary Jet Center and the Authority's agreement on Supplemental Rent in lieu of paying a percentage of its gross revenues.

      ii)     In addition, that provision did not reflect past or current practices at the Gary Airport. To Gary Jet Center's knowledge, no other commercial operator at the Gary Airport has either (1) a gross revenue provision incorporated in its lease with the Authority; or (2) paid any percentage of its gross revenues to the Authority.

86.    Because of those outdated provisions, Gary Jet Center requested—and the Authority promised Gary Jet Center before entering into the 2007 Lease—that the Authority

would revise the FBO Rules to create modern, updated minimum standards that actually reflected the current situation at the Gary Airport.

87.     But the Authority never followed through on that promise. So the outdated provisions in the FBO Rules remained.

88.     Gary Jet Center was not the only party calling for updated minimum standards at the Gary Airport. In 2007, the FAA told the Authority "to review and revise" the FBO Rules "to provide a current document meeting the needs of the Airport." The FAA gave the Authority 90 days to revise the FBO Rules.

89.     But the Authority did not comply with the FAA's directive—just as it failed to keep its promise with Gary Jet Center.

90.     Later efforts by the Authority to revise the minimum standards proved equally unsuccessful.

       a)  The Authority hired Steve Landry in 2010 as deputy airport director and charged him with completing new minimum standards. But Landry departed three years later without having prepared any new minimum standards.

       b)  In 2012, the Authority retained aviation consultant John Clark of J. Clark Aviation and charged him with completing new minimum standards. A year and a half and more than $700,000 in fees later, Clark hadn't even prepared a draft of the new standards.

91.     It was only after Gary Jet Center sued the Authority that the Authority finally began drafting updated minimum standards to replace the FBO Rules. *See Gary Jet Center v. Gary/Chicago International Airport Authority*, No. 2:13-CV-453 JVB (N.D. Ind.) (filed Dec. 9, 2013).

92.     The Authority precipitated that lawsuit when it decided, in June 2013, to waive *all* of the relevant FBO Rules—not just the outdated ones—for Gary Jet Center's competitor,

15

East Lake. *See id.*, Doc. 37. As a result, East Lake was able to operate as a full-service FBO despite not making the investment in hangars and fuel tanks that the FBO Rules required.

93.     After this Court ruled in Gary Jet Center's favor on the Authority's and East Lake's motions to dismiss, the parties agreed to settle that case. *See* No. 2:13-CV-453 JVB, Doc. 43. A genuine and authentic copy of the settlement agreement the parties executed is attached to this complaint as Exhibit D (the "Settlement Agreement").

94.     As part of the settlement, the parties agreed to do several things.

95.     First, Gary Jet Center agreed not to object to the Authority temporarily continuing to waive certain provisions in the FBO Rules so that East Lake would have time to come into compliance with those provisions. *See* Settlement Agreement at 1, ¶ 3(C). Those included the FBO Rules requiring a permanent 10,000 square foot building (¶ 7(a)(1)) and 35,000 gallons of aboveground fuel storage (¶ 7(a)(5)). Settlement Agreement at 1, ¶ 3(C). East Lake had a year and 90 days, after which it had to comply with those provisions of the FBO Rules. *Id.* at 2, ¶¶ 4(A) and 4(B).

96.     Second, the Authority agreed to waive for both Gary Jet Center and East Lake other provisions in the FBO Rules that no longer made sense. Those rules included the bond requirements in paragraph 7(a)(9) and the 1.5% gross revenue provision in paragraphs 7(a)(7), 7(b)(4), 7(c)(4), 7(d)(3), 7(e)(4), and 7(f)(4). *Id.* at 2, ¶ 4(D). Unlike the provisions that were only being temporarily waived for East Lake, the Settlement Agreement did not put any timeframe for either Gary Jet Center or East Lake to comply with these provisions; the parties understood that these provisions were outdated and would be superseded by the updated minimum standards.

97.     Third, with the waivers set forth above in place, both East Lake and Gary Jet Center agreed that they would be bound by the remaining FBO Rules and any amendments or changes to those FBO Rules that the Authority passed. *Id.* at 1, ¶ 3(B).

a) In order to put this agreement into effect, Gary Jet Center and the Authority entered into an amendment to the 2007 Lease clarifying that Gary Jet Center was bound by the FBO Rules. A genuine and authentic copy of that lease amendment is attached to this Complaint as Exhibit E ("Lease Amendment").

b) The Lease Amendment provided that the FBO Rules, and any amendments to the FBO Rules, would be binding on Gary Jet Center, notwithstanding anything in the 2007 Lease to the contrary.

c) Representatives from Gary Jet Center signed the Lease Amendment at the same time they signed the Settlement Agreement in which the Authority had waived the outdated provisions in the FBO Rules—including the bond and 1.5% gross revenue provisions.

98. Lastly, the Authority, Gary Jet Center, and East Lake all agreed to work together, in good faith, to update and revise the FBO Rules. Settlement Agreement at 3, ¶ 6. The Settlement Agreement set forth specific deadlines for getting the updated and revised minimum standards in place. *Id.*

99. The purpose of updating and revising the FBO Rules was to bring the Airport into compliance with current FAA guidance and industry best practices, to reflect what was actually happening at the Gary Airport, and to ensure that the regulations governing FBOs at the Gary Airport were uniformly applied; it was not about giving the Authority the opportunity to squeeze more revenue from airport tenants like Gary Jet Center.

100. In accordance with the deadlines set forth in the Settlement Agreement, the Authority circulated a draft of the updated and revised minimum standards to Gary Jet Center on December 5, 2014. A genuine and authentic copy of that draft is attached to this complaint as Exhibit F.

101.    Consistent with the Settlement Agreement and past practice at the Gary Airport, the Authority's first draft of the updated and revised minimum standards did not include any provision requiring airport tenants like Gary Jet Center to pay the Authority a percentage of their gross revenue.

102.    But the Authority's first draft was far from perfect; it had many deficiencies due to the fact that the Authority had simply copied and pasted the minimum standards in that draft from the minimum standards of another airport, Atlanta South Regional Airport, that had little in common with the Gary Airport. Gary Jet Center and its attorneys were therefore forced to expend substantial time and effort over the next five months helping the Authority revise the draft minimum standards to reflect the current situation at the Gary Airport, which was not at all similar to Atlanta South Regional Airport.

103.    After several more drafts had been exchanged, attorneys for Gary Jet Center and the Authority had a telephone conference on May 7, 2015 to work through the last remaining issues with the draft minimum standards.

104.    Towards the end of that three-hour telephone conference, attorneys for the Authority—for the first time during the eight-month drafting process—informed Gary Jet Center's attorneys that the Authority intended to include, in the new minimum standards, a requirement that each airport business pay the Authority a percentage of their gross revenues.

105.    On information and belief, AvPORTS and its agents, including Thomas Bartlett, were the driving force behind the Authority deciding to add that gross revenue tax eight months into the minimum standards revision process.

106.    In response to the announcement by the Authority's lawyers about the planned addition of a gross revenue tax to the minimum standards, and at the request of the Authority's lawyers, Gary Jet Center's lawyers provided the Authority with a letter dated May 20, 2015

18

explaining that (1) the Authority had never before collected a percentage of gross revenue from businesses at the Gary Airport; and (2) the Authority had affirmatively negotiated away the right to do so with Gary Jet Center in exchange for Supplemental Rent during the lease negotiations in 2007.

107.    Yet despite receiving that, the Authority, at the direction of AvPORTS, nevertheless continued to seek to include a gross revenue tax in the proposed minimum standards.

108.    On September 9, 2015, Wil Davis and Lynn Eplawy from Gary Jet Center met with Stephen Mays, the Chairman of the Authority's Board; Dan Vicari, the Airport Director; Bo Kemp, the Director of Economic Development for the City of Gary; and Thomas Bartlett, the Executive Vice President and Chief Operating Officer of AvPORTS.

109.    At that meeting, Mr. Davis provided AvPORTS's Bartlett with another letter and a draft complaint from Gary Jet Center's attorneys, both of which set forth why the proposed gross revenue tax was unprecedented at the Gary Airport, contradicted the parties' express agreement on Supplemental Rent as memorialized in the 2007 Lease, exceeded the Authority's powers under state law, and violated Gary Jet Center's constitutional rights.

110.    Despite that forewarning, AvPORTS's Bartlett nevertheless told Mr. Davis that he would tell the Authority's Board to pass the proposed minimum standards—including the new gross revenue tax—at the Board's meeting on Monday, September 14, 2015.

111.    Upon information and belief, the new gross revenue tax is not necessary to rectify any budget emergency or crisis that the Gary Airport is undergoing. Rather, as reported by AvPORTS to the Authority's Board, the Gary Airport had a $200,000 budget surplus in 2014, and airport revenues have been up in 2015 as compared to 2014.

112.     Upon information and belief, the real purpose of the gross revenue tax is to benefit AvPORTS by (1) raising the management fees that AvPORTS receives from the Authority; (2) helping AvPORTS meet its obligations under its agreements with the Authority; and (3) replacing revenues that the Authority has lost as a result of having to pay AvPORTS its management fees.

113.     At 9:11 p.m. on Friday, September 11, 2015, the Authority's counsel forwarded to Gary Jet Center's lawyer a final copy of the minimum standards "that will be adopted at our September 14 meeting." A genuine and authentic copy of those minimum standards are attached to this Complaint as Exhibit G.

114.     Those minimum standards included provisions that had never appeared in the six previous drafts that the Authority and AvPORTS had provided Gary Jet Center during the previous eleven-month revision process.

115.     Some of the new provisions are in sections 2.19, 2.30, 4.7.3, and Appendix A. Taken together, the new provisions in those sections take the agreement that Gary Jet Center and the Authority reached on Supplemental Rent in the 2007 Lease and flip it on its head.

116.     The deal struck in 2007—and memorialized in the 2007 Lease—was that Gary Jet Center would pay the Authority Supplemental Rent but not a percentage of its gross revenue.

117.     But under the new provisions in the minimum standards, Gary Jet Center will pay the Authority 1.5% of its gross revenues but not Supplemental Rent, which the Authority will credit towards Gary Jet Center's payment of the 1.5% gross revenue tax.

118.     In addition to unilaterally reversing the parties' agreement on Supplemental Rent contained in the 2007 Lease, the new provisions in the minimum standards unilaterally increase the rent that Gary Jet Center has to pay under the 2007 Lease from $.43 per square foot to $.50 per square foot.

20

119.    Sections 4.6.1 and 4.6.2 of the new minimum standards also require Gary Jet Center to pay to maintain the fuel farm—in contrast to the 2007 Lease, which did not include such a requirement.

120.    Lastly, the new minimum standards require Gary Jet Center, in section 4.7.5, to disclose confidential business information concerning its revenues to the Authority. Gary Jet Center has never before been required to provide such information to the Authority, and disclosing such information will cause competitive harm to Gary Jet Center.

121.    At the urging, recommendation, and direction of AvPORTS and its COO, Tom Bartlett, and over Gary Jet Center's objection, the Boardmembers, by unanimous vote, approved the minimum standards in Exhibit G at the September 14, 2015 board meeting.

122.    The rates and charges in the new minimum standards, including the 1.5% gross revenue tax, will take affect starting January 1, 2016.

123.    Gary Jet Center has therefore filed this suit seeking to enjoin the enforcement of the provisions in the new minimum standards (1) requiring Gary Jet Center to pay to maintain the fuel farm; (2) unilaterally increasing Gary Jet Center's rent to $.50 per square foot; (3) obligating Gary Jet Center to provide to the Authority confidential and proprietary information concerning Gary Jet Center's revenues; and (4) unilaterally imposing a 1.5% tax on Gary Jet Center's gross revenues.

**Claims for Relief**

**COUNT I:**
**Violation of Contract Clause and 42 U.S.C. § 1983**

124.    Gary Jet Center incorporates the allegations above into this paragraph.

125.    The Declaratory Judgment Act authorizes a federal court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

126.    The parties have a real and immediate conflict that meets the "actual controversy" requirements of the Declaratory Judgment Act as well as the case-or-controversy requirement in Article III of the United States Constitution.

127.    Specifically, the Authority, at AvPORTS's direction and over Gary Jet Center's objection, passed minimum standards containing a 1.5% gross revenue tax, a unilateral rent increase, and the requirement that Gary Jet Center pay to maintain the fuel farm at the September 14, 2015 meeting of the Authority's Board.

128.    By voting in favor of the 1.5% gross revenue tax, the unilateral rent increase, and the requirement that Gary Jet Center pay to maintain the fuel farm, the Boardmembers, acting under color of state law, and AvPORTS, acting jointly and in concert with the Boardmenbers, have deprived Gary Jet Center of federally protected rights, namely, the rights guaranteed by the Contract Clause in the United States Constitution.

129.    The 1.5% gross revenue tax, the rent increase, and the requirement that Gary Jet Center pay fuel farm maintenance will substantially impair Gary Jet Center's contractual rights under its 2007 Lease with the Authority by, among other things:

   a)   Conditioning Gary Jet Center's right to use the Airport to conduct business as an FBO, which the Authority granted to Gary Jet Center in the 2007 Lease, on Gary Jet Center making payments that Gary Jet Center did not agree to make in the 2007 Lease;

   b)   Unilaterally undoing the agreements that Gary Jet Center and the Authority reached in the 2007 Lease by granting the Authority what it expressly bargained

away during the 2007 lease negotiations, namely, the right to charge Gary Jet

Center a percentage of its gross revenues and the right to have Gary Jet Center

pay to maintain the fuel farm;

c)   Compromising material terms of the 2007 Lease, namely rent and Supplemental

Rent, by requiring Gary Jet Center to pay an additional amount that is more than

*quadruple* what Gary Jet Center is currently paying the Authority under the 2007

Lease in rent and Supplemental Rent combined; and

d)   Fundamentally altering the economics of the deal the parties struck in 2007 and

memorialized in the 2007 Lease.

130.   Neither the 1.5% gross revenue tax nor the rent increase nor the requirement that

Gary Jet Center pay to maintain the fuel farm is reasonable or necessary for an important public

purpose.

a)   Raising more revenue is not an important enough public purpose to justify a

municipality substantially impairing its own contractual obligations. *See, e.g.*, *U.S.

Trust Co. of New York v. New Jersey*, 431 U.S. 1, 26 (1977) ("A governmental entity

can always find a use for extra money . . . . If a State could reduce its financial

obligations whenever it wanted to spend money for what it regarded as an

important public purpose, the Contract Clause would provide no protection at

all.").

b)   As courts across this country have held (*see, e.g.*, *S. Cal. Gas Co. v. City of Santa Ana*,

336 F.3d 885, 897 (9th Cir. 2003)), governments can find other ways to raise

revenue that do not result in substantially impairing the government's own

contracts.

23

131.   Because the Airport's Board, the policymaker for the Authority, will have caused this violation of Gary Jet Center's federal rights, the Authority itself is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny.

132.   Gary Jet Center therefore requests that this Court declare that Defendants, by passing minimum standards containing the 1.5% gross revenue tax, the unilateral rent increase, and the requirement that Gary Jet Center pay to maintain the fuel farm, violated 42 U.S.C. § 1983 and deprived Gary Jet Center of its rights guaranteed by the Contract Clause of the United States Constitution.

### COUNT II:
### Declare That the Percentage Tax on Gross Revenue Exceeds
### The Authority's Powers under Indiana Law and is Therefore *Ultra Vires*

133.   Gary Jet Center incorporates the allegations above into this paragraph.

134.   The Authority's 1.5% gross revenue tax is a business income tax, not a user fee, because:

a)   It is based on gross revenue;

b)   Its purpose is to raise revenue;

c)   It generally applies to all airport Operators regardless of how they use the Airport; and

d)   Operators like Gary Jet Center already pay user fees for their use of the Airport, including fuel flowage fees, parking fees, landing fees, rent, and Supplemental Rent.

135.   Indiana law requires a municipality like the Authority to have specific statutory authority to impose a tax.

136.    The Authority does not have any statutory authorization to levy a business income tax.

137.    Gary Jet Center therefore requests that this Court declare that the 1.5% gross revenue tax exceeds the Authority's power under state law and may not be enforced.

## COUNT III:
## Breach of Contract – Settlement Agreement

138.    Gary Jet Center incorporates the allegations above into this paragraph.

139.    The Settlement Agreement is a valid and enforceable contract between Gary Jet Center and the Authority.

140.    Gary Jet Center has fulfilled all of its obligations under the Settlement Agreement.

141.    The Settlement Agreement requires the Authority "to work together with [Gary Jet Center], in good faith, to revise and prepare updated minimum standards for fixed base operators at the Gary Airport." Settlement Agreement at 3, ¶ 6. The Settlement Agreement defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." *Id*. at 5, ¶ 18 (citing Ind. Code § 26-1-1-201(19)). The Settlement Agreement further provides that the Authority's failure to act in good faith is an "Event of Default" under the Settlement Agreement. *Id*. at 5, ¶ 12(G).

142.    The Authority has breached the Settlement Agreement by failing to work in good faith with Gary Jet Center to update and revise the minimum standards at the Gary Airport.

143.    As the foregoing allegations show, the Authority has breached is obligation to work in good faith and observe reasonable commercial standards of fair dealing by, among other things:

   a)   Subverting the minimum standards revision process, which was supposed to be about bringing the Airport into compliance with current FAA guidance

and industry best practices, reflecting what was actually happening at the Gary Airport, and ensuring that the regulations governing FBOs at the Gary Airport were uniformly applied, by using it instead as an opportunity to unilaterally renegotiate material terms in Gary Jet Center's lease;

b) Reneging on its agreement with Gary Jet Center on Supplemental Rent in the 2007 Lease by using the minimum standards to require Gary Jet Center to pay a percentage of its gross revenues to the Authority;

c) Waiting eight months into the minimum standards revision process before revealing to Gary Jet Center its intention to include a gross revenue tax in the revised minimum standards;

d) Not providing the final version of the new minimum standards—with the new gross revenue provisions—to Gary Jet Center until 9:11 p.m. the Friday before the Authority's Board voted, on Monday, September 14, 2015, to adopt those revised minimum standards;

e) Intentionally including provisions in the new minimum standards that contradict material terms in the 2007 Lease, such as fuel farm maintenance, rent, and Supplemental Rent, and attempting to justify those deliberately contradictory provisions by pointing to the Lease Amendment, which Gary Jet Center had entered into with the Authority, in good faith, on the understanding that the Lease Amendment was necessary to ensure that the minimum standards applied uniformly to all airport operators—and not on the understanding that Gary Jet Center was giving the Authority a blank check to unilaterally rewrite material terms in the 2007 Lease;

26

    f)   Using the minimum standards to try to raise revenue rather than for the legitimate purposes set forth in the FAA's guidance, including but not limited to those purposes found in FAA Advisory Circular 150/5190-7, "Minimum Standards for Commercial Aeronautical Activities";

    g)   Disregarding industry best practices in preparing the revised minimum standards; and

    h)   Misusing its regulatory power to subvert and substantially impair Gary Jet Center's contractual rights.

144.    As a result of the Authority's breaches, Gary Jet Center has suffered damages in an amount to be determined at trial.

## COUNT IV:
## Intentional Interference with a Contractual Relationship

145.    Gary Jet Center incorporates the allegations above into this paragraph.

146.    AvPORTS knew about the Settlement Agreement and the Authority's obligation to act in good faith to update and revise the minimum standards governing FBOs at the Gary Airport.

147.    AvPORTS further knew that the proposed gross revenue tax was contrary to the agreement that Gary Jet Center and the Authority reached on Supplemental Rent in the 2007 Lease, exceeded the Authority's powers under state law, and would violate Gary Jet Center's constitutional rights under the Contract Clause if passed.

148.    AvPORTS nevertheless intentionally induced the Authority to breach the Settlement Agreement as set forth in Count III above by directing the Boardmembers to vote for the new minimum standards that included a 1.5% gross revenue tax.

149.     AvPORTS did so, not for any legitimate business reason or justification, but for improper and selfish purposes, including but not limited to increasing its own management fees and standing at the Gary Airport at the expense of Gary Jet Center.

150.     AvPORTS's actions were not fair and reasonable under the circumstances.

151.     As a result of AvPORTS's unlawful actions, Gary Jet Center has suffered damages in an amount to be determined at trial.


**COUNT V:**
**Request for Preliminary and Permanent Injunctive Relief**

152.     Gary Jet Center incorporates the allegations above into this paragraph.

153.     Under Federal Rule of Civil Procedure 65, Gary Jet Center requests that the Court, after a hearing, enter a preliminary injunction against Defendants enjoining them from taking any action to enforce the provisions in the new minimum standards that (1) impose a 1.5% tax on gross revenues; (2) unilaterally increase Gary Jet Center's rent; (3) mandate disclosure of Gary Jet Center's confidential and proprietary business information; or (4) require Gary Jet Center to pay to maintain the fuel farm; and award other relief as the Court deems just and appropriate.

154.     After final trial or consolidation and advancement of the trial with hearing on the preliminary injunction, Gary Jet Center requests that the Court enter a permanent injunction enjoining the Defendants from taking any action to enforce new minimum standards that (1) impose a 1.5% tax on gross revenues; (2) unilaterally increase Gary Jet Center's rent; (3) mandate disclosure of Gary Jet Center's confidential and proprietary business information; or (4) require Gary Jet Center to pay to maintain the fuel farm; and award to Gary Jet Center all other appropriate relief.

## COUNT VI:
## Attorneys' Fees and Costs

155.    Gary Jet Center incorporates the allegations above into this paragraph.

156.    Gary Jet Center is entitled to recover court costs and all reasonable attorneys' fees under Article XIV.C of the 2007 Lease, paragraph 12 of the Settlement Agreement, 42 U.S.C. § 1988, and Indiana Code § 54-32-1-1.

WHEREFORE, Gary Jet Center requests that the Court enter judgment in Gary Jet Center's favor and against the Defendants and award Gary Jet Center the following relief:

a)    Declaratory relief as set forth above;

b)    Preliminary and permanent injunctive relief enjoining the Defendants from violating Gary Jet Center's federal rights, from exceeding the Authority's power under Indiana law, and from enforcing the percentage tax on gross income, the unilateral rent increase, and the requirements that Gary Jet Center pay for fuel farm maintenance and disclose confidential business information about its revenues to the Authority;

c)    Other equitable relief consistent with the above;

d)    Legal damages in an amount to be determined at trial;

e)    Interest as allowed by law, court costs, and attorneys' fees; and

f)    All other just and proper relief.

Respectfully submitted,

**LADUE CURRAN & KUEHN LLC**

/s/ John D. LaDue
John D. LaDue (19039-71)
John A. Conway (27712-71)
Paul Edgar Harold (25917-71)
200 First Bank Building
205 West Jefferson Boulevard
South Bend, Indiana 46601
Telephone: (574) 968-0760
Facsimile: (574) 968-0761
jladue@lck-law.com
jconway@lck-law.com
pharold@lck-law.com

*Attorneys for Plaintiff Gary Jet Center, Inc.*